```
                                          ┌─────────────────────────────┐
                                          │ USDC SDNY                   │
                                          │ DOCUMENT                    │
                                          │ ELECTRONICALLY FILED        │
UNITED STATES DISTRICT COURT              │ DOC #:                      │
SOUTHERN DISTRICT OF NEW YORK             │ DATE FILED:  7-9-08         │
- - - - - - - - - - - - - - - - - - - -X  └─────────────────────────────┘
UNITED STATES OF AMERICA,          :

          -against-                : S2 04 Cr. 356 (JFK)
                                   :
OUSSAMA ABDULLAH KASSIR,           : OPINION and ORDER
   a/k/a "Abu Abdullah,"           :
   A/k/a "Abu Khadija,"            :
                                   :
             Defendant.            :
- - - - - - - - - - - - - - - - - - - -X
```

APPEARANCES:

          For the United States of America:
               MICHAEL J. GARCIA
               United States Attorney for the
               Southern District of New York
               New York, New York
               Of Counsel: Michael Farbiarz
                           Assistant United
                               States Attorney

          For the Defendant:
               Mark S. DeMarco, Esq.
               Bronx, New York
               Edgardo Ramos, Esq.
               New York, New York

**JOHN F. KEENAN, United States District Judge**

**JOHN F. KEENAN, United States District Judge:**

## Background

Defendant moves to Lift the Special Administrative Measures ("SAMs") that have been imposed on him while in detention awaiting trial.

On February 6, 2006, a superseding Indictment ("Indictment") was filed charging Kassir and two co-conspirators with terrorism related offenses.

On September 25, 2007, the defendant was brought to the Southern District of New York from the Czech Republic, following an extradition proceeding. He was arraigned on September 25th, and detained. Since September 25, 2007, Kassir has been imprisoned at the Metropolitan Correctional Center ("MCC") in Manhattan.

In a letter dated September 26, 2007 to the United States Department of Justice, the United States Attorney for the Southern District of New York requested, pursuant to 28 C.F.R. § 501.3(c), that SAMs be imposed upon Kassir. Along with the September 26th letter, the United States Attorney sent a memorandum ("Supporting Memorandum"). The Supporting Memorandum is attached as Exhibit A.

As described in the Supporting Memorandum, Kassir was a follower of the radical Islamic cleric Abu Hamza al-Masri, who is a co-defendant. See Ex. A (Supporting Memorandum) at 1.

-2-

Along with a particular co-conspirator, who is an American,
Kassir provided support to al-Qaeda by coming to the United
States and attempting to establish a Jihad training camp in
Bly, Oregon. Kassir told witnesses in the United States that
he supported al-Qaeda and Usama Bin laden, and that he had
previously undertaken jihad training in Afghanistan, Lebanon,
and Kashmir. While in America, Kassir was seen in possession
of a compact disk that contained information on making bombs
and poisons. While at Bly, Kassir threatened to kill the
American co-conspirator and bury him on the property at Bly,
because there were too few men at the Bly property for Kassir
to train. In addition, the Supporting Memorandum noted that
Kassir has been charged with developing and operating several
extremist websites which promoted terrorism and disseminated
terrorist manuals, such as "The Mujahiden Explosives Handbook"
and "The Mujahiden Poisons Handbook."

The Acting Attorney General, Peter D. Keisler, by
memorandum to the Director of the Federal Bureau of Prisons
dated October 25, 2007 ("Attorney General Memorandum"),
requested that certain listed SAMs be imposed on Kassir. See
Exhibit B (Attorney General Memorandum and SAMs). The Attorney
General Memorandum described some of the information enumerated
in the Supporting Memorandum, and also provided certain
additional information. The Attorney General Memorandum

-3-

indicated that "[t]he purpose of the Bly jihad training camp was to provide a place where terrorists could receive various types of training, including military training to gain familiarity with weapons or to prepare for additional military training in Afghanistan." Id.

Kassir has moved to lift the SAMs that have been imposed on him, claiming that the SAMs violate various provisions of the United States Constitution. See SAMs Motion passim.

## Discussion

The Government urges that the motion should be denied because the defendant has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). The defense counters in its Reply Memorandum that this is a "motion," not an "action," as required by the PLRA citing, United States v. Hashimi, 2008 U.S. Dist. Lexis 3801 (S.D.N.Y. 2008) and United States v. Ayala Lopez, 327 F. Supp. 2d 138 (D.P.R. 2004). I will leave a decision on that momentous issue to more learned heads than mine and decide this motion on the merits. See Woodford v. Ngo, 548 U.S. 81, 101 (2006) (stating that the PLRA exhaustion provision is not jurisdictional and "allow[s] a district court to dismiss plainly meritless claims without first addressing what may be a much more complex [exhaustion] question").

-4-

Under the Supreme Court decision in Turner v. Safley, 482 U.S. 78, 87 (1987), a prison regulation that "burdens" federal constitutional rights is constitutional so long as it is "'reasonably related' to legitimate penological objectives." These "legitimate penological objectives" include concerns relating to "institutional security." See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987).

Turner controls here. The Supreme Court has explained that "Turner applies to all circumstances in which the needs of prison administration implicate constitutional rights," Washington v. Harper, 494 U.S. 210, 224 (1990). The Court of Appeals has assessed a challenge to the constitutionality of particular SAMs under the "reasonably related" standard set forth in Turner. See United States v. El-Hage, 213 F.3d 74, *82 (2d Cir. 2000). The various claims advanced in Defendant's Motion are not persuasive.

Defendant contends that the SAMs are "impermissibly interfering," with his right to counsel. Def. Memo at 7. This argument has no merit.

First, the defendant notes that the Government has produced a "vast amount of computerized materials" in discovery -- and complains that he has "been unable to review certain of these materials due to the limitations of the equipment provided for his use." But he acknowledges that "the

-5-

Government has provided (him) with a laptop computer equipped with software apparently sufficient to review the computer discs that have been produced in discovery, has supplemented the meals he receives and has amended the SAM provisions concerning access to newspapers, radio and television." (Defense Reply Memo., p. 2). Further, the Government in its memorandum, p. 16, points out that Mr. Kassir is "the only prisoner in the MCC who has access to his own computer for discovery review purposes." This fact alone does much to diminish defendant's claims. The SAMs do not restrict how the defendant reviews discovery, or what "equipment," Def. Memo. at 7, he may use to do so.

Moreover, it bears noting that with the exception of Kassir, every other prisoner at the MCC who wishes to review electronic discovery must do so at a scheduled time, using computers allocated by the MCC for shared usage by prisoners. As the only prisoner in the MCC who has access to his own computer for discovery-review purposes, Kassir is at something of an advantage. The Government provided this computer to the MCC, to be used solely by Kassir for reviewing electronic discovery -- and MCC correctional officers assigned to Kassir's floor report that he routinely spends up to four hours at a time sitting and reviewing discovery materials on the computer. Indeed, the Government has recently received a request from the

-6-

MCC for a new computer battery.  Because Kassir's discovery-
review sessions have been so lengthy, a back-up battery is
required.  In these circumstances, Kassir's complaints about
the "equipment" available to him ring especially hollow.

Kassir and his lawyers are permitted only non-contact
meetings.  Defendant contends that "the nature of the visits
prevent counsel and Mr. Kassir from reviewing particular
documents together." Def. Memo. at 7.  When they meet,
defendant and his lawyers have to sit across the table from one
another, separated by a metallic screen.

Those on both sides of the screen can see through
it and can speak to each other without the need for an
amplification device.  This arrangement does not "prevent"
documents from being simultaneously reviewed by the defendant
and his lawyers.  The defense lawyers have sent many boxes of
documents to Kassir.

The Government has suggested a reasonable course of
action.  Defense counsel can bring a copy of a particular
document to a non-contact meeting and ask Kassir to bring his
copy of the document to the same meeting.  Defendant and his
attorneys could then simultaneously review the document in
question, each on their own side of the screen.  At these non-
contact meetings, Kassir's attorneys are allowed to pass up to
three inches of documents to Kassir, through an MCC officer.

The Government maintains that this comes to approximately 1,400 pages of documents per visit. Even if the Government is overestimating, the number of pages is huge. This also permits the attorneys and Kassir to review documents together, with defense counsel referring to his copy of a document and the defendant referring to the copy just passed to him.

None of this burdens the defendant's Sixth Amendment rights -- and to the extent the requirement of "non-contact meetings" imposes any burden on document-sharing between the defendant and his counsel, this requirement is "reasonably related" to the MCC's legitimate objective of protecting institutional security. See Turner, 482 U.S. at 87, 96-97 (requiring that a restriction be "reasonably related" to legitimate penological objectives if it "burdens" a constitutional right). Kassir has said that he received jihad training in Afghanistan; that he supports Usama Bid Laden; and that he would kill a person and bury that person's body for not having a sufficiently large enough jihad training operation in place at Bly, Oregon. Kassir has been charged by a Grand Jury with providing material support to al-Qaeda.

It must be noted that during 2000, a pre-trial MCC detainee against whom a charge of providing material support to al-Qaeda is still pending, stabbed an MCC officer in the eye as part of a conspiracy to take hostages, including defense

lawyers visiting clients in the prison.  See United States v. Salim, 287 F. Supp. 2d 250, 290-301 (S.D.N.Y. 2001).  Given what is known about Kassir, and given the MCC's experience with other al-Qaeda-associated inmates, it is perfectly reasonable to limit the physical contact between Kassir and his attorneys. To do less could jeopardize the safety of the attorneys and any MCC officers who would have to assist a lawyer if a physical confrontation arose.

Defendant contends that the SAMs violate his Sixth Amendment right to counsel because "the limitation on counsel's ability to rely on paralegals, investigators, and other staff to meet with the defendant, or to share information freely with them prevents counsel from having their staff or the investigator employed by the defense communicate as they see fit with experts or witnesses." Def. Memo. at 7-8.  These claims have no merit.  The SAMs explicitly allow paralegals to meet with the defendant.  See Ex. B (Attorney General Memorandum and SAMs) at §2(e).  Defense counsel is permitted to "share information freely," Def. Memo. at 8, provided that the purpose of doing so is "preparing the inmate's defense." Ex. B (Attorney General Memorandum and SAMs) at §2(d).  Under the SAMs, an investigator may meet with the defendant when defense counsel or a paralegal is present.  See Ex. B (Attorney General Memorandum and SAMs at §2(e),(f).

It must be kept in mind that in this case, I have
assigned two defense counsel under the Criminal Justice Act,
not one as is the usual case.   There should be no problem in
setting up meetings between the investigator and the defendant
at which one of the defense lawyers or a paralegal is present.
If there is any burden on the defendant's Sixth Amendment
rights in this regard, it is minimal and "reasonably related"
to the goal of institutional security.   The result of breaching
the SAMs can be severe.   See United States v. Sattar, 395 F.
Supp. 2d 79, 85-88 (S.D.N.Y. 2005) (describing message to
terrorists, conveyed in violation of SAMs, that a cease-fire
should not be observed).

Kassir urges that the SAMs violate his Sixth Amendment
right to counsel because they require him to "disclose [his]
defense to the government before trial."  Def. Memo. at 8.   The
basis for this argument is that, under the SAMs, a certain sub-
class of materials must be pre-cleared by the United States
Attorney's Office before they are provided by defense counsel
to the defendant.   See id.  This sub-class of materials
includes "inflammatory materials,...military training manuals,
or materials that may be used to pass messages from inmate to
inmate."  See Exhibit B (Attorney General Memorandum and SAMs)
at §2(h)(i)-(ii).  Given Kassir's background and the charges
against him, these restrictions are reasonably related to a

concern for institutional security.  See Turner, 482 U.S. at
87.  Someone who describes himself as a follower of Usama Bin
Laden, who has received jihad training, cannot expect
unfettered access to "military training manuals."

The Government notes at p. 20 of its memorandum that
"[N]o request for pre-clearance of any materials has been made
to the U.S. Attorney's Office.  If a pre-clearance request is
ultimately made, the Government will work with defense counsel
toward a resolution of any such request that balances the
defendant's Sixth Amendment rights with the MCC's need to
maintain a safe environment.  See June 2, 2008 Order (directing
counsel to "confer and attempt to resolve any issues of an
administrative or similar nature before addressing them to the
Court"); cf. May 29, 2008 Government Letter to the Court at 1,
n.1 (noting that, with respect to certain SAMs issues, the
Government has employed a "wall agent").  It makes little sense
for the defendant to complain about deficiencies in a pre-
clearance mechanism that he has not even attempted to use.

The SAMs were imposed based on facts "unique[]" to
Kassir.  The Supporting Memorandum and the Attorney General
Memorandum both describe actions that Kassir has himself
undertaken.  See supra.  The defendant does not disagree.  He
argues that the SAMs were imposed in an "automatic[]" way, Def.
Memo. at 7, because, on the defendant's information and belief,

-11-

a number of people accused of being associated with al-Qaeda
have been subjected to SAMs similar to those at issue here.
See Def. Memo. at 6 (referring to SAMs imposed on Ahmed Ressam
and Zacarias Moussaoui).  But even if true, this proves
nothing.  Kassir has been charged with providing material
support to al-Qaeda and the evidence against Ressam, who sought
to blow up the Los Angeles airport, and Moussaoui suggested
that they were associated with al-Qaeda, as well.  Treating
like cases alike, with respect to SAMs or in any other context,
is the hallmark of particularized, fact-specific decision-
making -- not of the sort of reflexive, "automatic"
determination that the defendant suggests the Acting Attorney
General made here.

        Mr. Kassir also states that "[h]e has been twice
punished for alleged violations" of the SAMs.  He asserts that
the "alleged violations, if proved, are de minimus." (sic).
Def. Memo. at 10.  This is irrelevant.  Because Kassir has been
punished for violating the SAMs has no bearing on their
constitutionality.

        The Government claims his "description of his two
violations is inaccurate," but that has nothing to do with
whether his constitutional rights are being violated.

-12-

One of the disciplinary actions against the defendant was occasioned by his speaking, apparently in Arabic, to another inmate who had pleaded guilty to al-Qaeda conspiracies and whose cell turned out to contain hidden weapons. The claim that

this violation by Kassir was "de minimus" (sic) is meritless.

There are a series of other complaints by the defendant such as: his newspapers are edited; he can only purchase certain food at the MCC commissary and his lawyer is not allowed to communicate to the media. All of these and other limitations have a reasonable basis.

Newspaper ads could contain hidden messages; other prisoners in the Special Housing Unit at the MCC have the same commissary restrictions as does Kassir. As of May 22, 2008, he spent over $538 in the commissary. The Court well recalls that for a significant period of his incarceration, Mr. Kassir was on a hunger strike. Expenditures of more than $538 at the commissary hardly demonstrate unconstitutional restrictions. There is nothing in the SAMs that precludes his lawyers from discussing the nature of the charges with third parties or reporting what happened in Court.

A specific reading of Exhibits A and B discloses that the SAMs in this case are reasonable and designed to insure institutional security while affording Mr. Kassir his

-13-

constitutional rights and permitting his lawyers to prepare
adequately for the trial of this case.

The motion is denied in all respects.

**SO ORDERED.**

Dated: New York, New York
July 8, 2008

**JOHN F. KEENAN**
**United States District Judge**



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 26, 2007

**VIA FACSIMILE (202-514-0163)**
Maureen Killion, Director
Office of Enforcement Operations
Criminal Division
United States Department of Justice
1301 New York Avenue, Suite 1200
Washington, D.C. 20005

> Re:   Request for Special Administrative Measures Confinement
> Restrictions on Federal Bureau of Prisons (BOP) Inmate Oussama
> Kassir (USMS Registration number 05151-748)

Dear Ms. Killion:

Pursuant to 28 C.F.R. § 501.3(c), I am hereby requesting that special
administrative measures (SAM) confinement restrictions be imposed on Federal Bureau of
Prisons inmate Oussama Kassir (Kassir) by the Attorney General.

As the United States Attorney for the Southern District of New York, I am hereby
notifying the Attorney General that SAM, pursuant to 28 C.F.R. § 501.3, on Kassir are
reasonably necessary to protect persons against the risk of death or serious bodily injury because
I find that there is clear and convincing evidence of a substantial risk that Kassir's
communications or contacts with persons could result in death or serious bodily injury to
persons, or substantial damage to property that would entail the risk of death or serious bodily
injury to persons.

Very truly yours,

MICHAEL J. GARCIA  DR/KM
United States Attorney
Southern District of New York

LIMITED OFFICIAL USE

MEMORANDUM FOR HARLEY G. LAPPIN
                    DIRECTOR
                    FEDERAL BUREAU OF PRISONS

FROM:          Alice S. Fisher
               Assistant Attorney General

SUBJECT:       Origination of Special Administrative Measures (SAM) Pursuant to
               28 C.F.R. § 501.3 for Federal Prison Inmate Oussama Kassir

     Federal prison inmate Oussama Kassir (Kassir) is charged in twelve terrorism counts based on his participation in two different terrorist conspiracies.  The charges relate to his participation in an effort to establish a jihad training camp in Bly, Oregon, and his operation of several terrorist websites.  Kassir is currently housed at the Metropolitan Correctional Center in Manhattan (Registration number 05151-748), where he has been incarcerated since September 25, 2007 following his extradition from the Czech Republic.  His case is currently pending before the Honorable John F. Keenan.  A trial date has not yet been set.

     Oussama Kassir, also known as "Abu Abdullah" and "Abu Khadija," was a follower of radical Islamic cleric Abu Hamza al-Masri, who is charged as a co-defendant in the same case.  The five Bly, Oregon jihad training camp charges relate to the efforts of Kassir, Abu Hamza, Haroon Aswat, and cooperating witness                    to establish a jihad training camp on a parcel of property located in Bly, Oregon.  Those counts primarily accuse Kassir of providing material support to terrorists and, in particular, the al Qaeda terrorist organization, for his activities in Bly.  The purpose of the Bly jihad training camp was to provide a place where Muslims could receive various types of training, including military-style jihad training, and gain enough familiarity with weapons to fight jihad or to continue with additional jihad training in Afghanistan.  In Bly, KASSIR told witnesses that he supported Usama Bin Laden and al Qaeda, and that he had previously undertaken jihad training in Afghanistan, Kashmir, and Lebanon.  A witness also saw KASSIR in possession of a compact disc that contained instructions on how to make bombs and poisons.  While at Bly, Kassir also threatened to kill James Ujaama and bury him on the property because there were too few men located at Bly for Kassir to train.

     In the terrorist website counts, Kassir is charged with developing and operating several websites which promoted terrorism and contained terrorist manuals, such as "The Mujahideen Explosives Handbook" and "The Mujahideen Poisons Handbook."  Thus, seven of the counts accuse Kassir of operating terrorist websites on the internet.  Those counts also include material support charges, and further allege violations of statutes which make it illegal to (1) provide assistance in the development, production, and use of chemical weapons, and (2) distribute information relating to explosives, destructive devices, and weapons of mass destruction.

SPECIAL ADMINISTRATIVE MEASURES (SAM)                                            Page 2
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir

<u>LIMITED OFFICIAL USE</u>

Kassir was arrested at the airport in the Czech Republic on December 11, 2005, based upon the charges filed in the Southern District of New York. He has been detained in the Czech Republic, pending extradition to the United States, since that date.

Based upon information provided to me of Kassir's proclivity for violence, I find that there is substantial risk that his communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons. **Therefore, I am requesting that you, pursuant to 28 C.F.R. § 501.3, implement SAM to restrict Kassir's access to the mail, the media, the telephone, and visitors.** This SAM will commence immediately upon notice to the inmate and will be in effect for one (1) year, subject to my further direction.

1.    **General Provisions:**

   a.    **Adherence to Usual United States Marshals Service (USMS), Bureau of Prisons (BOP) and Detention Facility (DF) Policy Requirements** - In addition to the below-listed SAM, the inmate must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

   b.    **Interim SAM Modification Authority** - During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify the inmate's SAM as long as any SAM modification authorized by OEO:

      i.    Does not create a more restrictive SAM;

      ii.   Is not in conflict with the request of the Counterterrorism Section (CTS/NSD), the U.S. Attorney for the Southern District of New York (USA/SDNY), Federal Bureau of Investigation (FBI), or USMS/BOP/DF, or applicable regulations; and

      iii.  Is not objected to by the CTS/NSD, USA/SDNY, FBI, or USMS/BOP/DF.

   c.    **Inmate Communications Prohibitions** - The inmate is limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from

<u>LIMITED OFFICIAL USE</u>



**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                                      Page 3
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir

LIMITED OFFICIAL USE

having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else except as outlined and allowed by this document that could reasonably foreseeably result in the inmate communicating information (sending or receiving) that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) information relating to terrorist information.

d.   **Use of Interpreters/Translators by USMS/BOP/DF** - Translator approval requirement:

    i.   USMS/BOP/DF may use Department of Justice (DOJ)-approved translators as necessary for the purpose of facilitating communication with the inmate.

    ii.   No person shall act as a translator without prior written clearance/approval from USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/SDNY.

    iii.   Translators utilized by USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with the inmate. Translators shall not be alone with the inmate, either in a room or on a telephone or other communications medium.

2.   **Attorney/Client Provisions:**

a.   **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** - The inmate's attorney (or counsel) – individually by each if more than one (1) – must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his/her awareness and understanding of the SAM provisions and his/her agreement to abide by these provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth

---

[1] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/SDNY, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one (1) attorney where the inmate is represented by two (2) or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

LIMITED OFFICIAL USE

LIMITED OFFICIAL USE

in the conclusions supporting the SAM. However, in signing the affirmation, the inmate's attorney, and pre-cleared staff, acknowledge the restriction that they will not forward third-party messages to or from the inmate.

  i.    The USA/SDNY shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to the inmate's attorney.

  ii.   After initiation of SAM and prior to the inmate's attorney being permitted to have attorney/client-privileged contact with the inmate, the inmate's attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/SDNY.

  iii.  The USA/SDNY shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to the Office of Enforcement Operations (OEO) in Washington, DC and the USMS/BOP/DF.

b.   **Attorney Use of Interpreters/Translators -**

  i.    Necessity Requirement - No interpreter/translator (translator) shall be utilized unless absolutely necessary where the inmate does not speak a common language with the attorney. Any translator shall be precleared.[2]

  ii.   Attorney Immediate Presence Requirement - Any use of a translator by the attorney shall be in the physical and immediate presence of the attorney - in the same room. The attorney shall not patch through telephone calls, or any other communications, to or from the inmate.

  iii.  Translation of Inmate's Correspondence - An attorney of record may only allow a federally-approved translator to translate the inmate's correspondence as necessary for attorney/client privileged communication.

_____

    [2] "Precleared" refers to a translator, who is actively assisting the inmate's attorney with the inmate's defense, who has submitted to a background check by the FBI and USA/SDNY, who has successfully been cleared by the FBI and USA/SDNY, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to adhere to the SAM restrictions and requirements.



SPECIAL ADMINISTRATIVE MEASURES (SAM)                                Page 5
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir

<u>LIMITED OFFICIAL USE</u>

c.   **Attorney/Client Privileged Visits** - May be contact or non-contact, at the discretion of the USMS/BOP/DF.

d.   **Attorney May Disseminate Inmate Conversations** - The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of providing necessary legal services related to the preparation for trial – and not for any other reason – on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff.

e.   **Unaccompanied Attorney's Pre-cleared Paralegal(s)[3] May Meet With Client** - The inmate's attorney's pre-cleared paralegal(s) may meet with the inmate without the necessity of the inmate's attorney being present. An investigator or translator may not meet alone with the inmate. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

f.   **Simultaneous Multiple Legal Visitors** - The inmate may have multiple legal visitors provided that at least one (1) of the multiple legal visitors consists of the inmate's attorney or pre-cleared paralegal. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

g.   **Legally Privileged Telephone Calls** - The following rules refer to all legally-privileged telephone calls or communications:

    i.   Inmate's Attorney's Pre-cleared Staff May Participate in Inmate Telephone Calls - The inmate's attorney's pre-cleared staff are permitted to communicate directly with the inmate by telephone, provided that the inmate's attorney is physically present and participating in the legal call as well.

---

[3] "Precleared" when used with regard to an attorney's staff, or "pre-cleared staff member," refers to a co-counsel, paralegal, or an investigator who is actively assisting the inmate's attorney with the inmate's defense, who has submitted a to a background check by the FBI and USA/SDNY, who has successfully been cleared by the FBI and USA/SDNY, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one (1) staff member, and the provisions of this document shall be fully applicable to each such staff member in his/her individual capacity. A "paralegal" will also be governed by any additional DF rules and regulations concerning paralegals.

<u>LIMITED OFFICIAL USE</u>



**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                        Page 6
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir

<u>LIMITED OFFICIAL USE</u>

    ii.    Inmate's Initiation of Legally-Privileged Telephone Calls - Inmate-initiated telephone communications with his attorney or pre-cleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to the inmate only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is the inmate's attorney. This privilege is contingent upon the following additional restrictions:

    (1)    The inmate's attorney will not allow any nonpre-cleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate.

    (2)    The inmate's attorney must instruct his/her staff that:

    (a)    The inmate's attorney and pre-cleared staff are the only persons allowed to engage in communications with the inmate.

    (b)    The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's communications to third parties.

    (3)    No telephone call/communication, or portion thereof, except as specifically authorized by this document:

    (a)    Is to be overheard by a third party.[4]

    (b)    Will be patched through, or in any manner forwarded or transmitted to a third party.

    (c)    Shall be divulged in any manner to a third party, except as otherwise provided in Section 2d.

---

    [4] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney/client- privileged communications.

LIMITED OFFICIAL USE

(d)     Shall be in any manner recorded or preserved.[5]  The inmate's
        attorney may make written notes of attorney/client -privileged
        communications.

(4)     If USMS/BOP/DF, FBI or USA/SDNY determines that the inmate has
        used or is using the opportunity to make a legal call to speak with
        another inmate or for any other non-legal reason that would
        circumvent the intent of the SAM, the inmate's ability to contact his
        attorney by telephone may be suspended or eliminated.

h.      **Documents Provided by Attorney to Inmate** - The inmate's attorney may provide
        his/her client with or review with the inmate, documents related to trial preparation
        so long as any of the foregoing documents are translated, if translation is necessary,
        by a pre-cleared translator. Any document not related to trial preparation must be sent
        to the inmate via general correspondence and will be subject to the mail provisions of
        subparagraphs 2i and 3g. Documents previously reviewed and cleared for receipt by
        the inmate, and already in the inmate's possession at the outset of the visit, may be
        discussed or reviewed by the inmate and the inmate's attorney during the visit.

        i.      None of the materials provided may include inflammatory materials,
                materials inciting to violence or military training materials, or
                materials that may be used to pass messages from inmate to inmate,
                unless such materials have been precleared by the USA/SDNY and the
                FBI.

        ii.     The USA/SDNY may authorize additional documents to be presented
                to the inmate. If any document not listed or described above needs to
                be transmitted to the inmate, consent for the transmission of the
                document can be obtained from the USA/SDNY without the need to
                formally seek approval for an amendment to the SAM.

---

[5] Except by USMS/BOP/DF/FBI/DOJ or other duly authorized federal authorities. This
section does not allow monitoring of attorney/client-privileged communications.



**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                    Page 8
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir

<u>LIMITED OFFICIAL USE</u>

    i.     **Legal Mail** - The inmate's attorney may not send, communicate, distribute, or divulge the inmate's mail, or any portion of its contents (legal or otherwise), to third parties.[6]

          In signing the SAM acknowledgment document, the inmate's attorney and pre-cleared staff will acknowledge the restriction that only inmate case-related documents will be presented to the inmate, and that neither the attorney nor his/her staff will forward third-party mail to or from the inmate.

3.    **Inmate's Non-legal Contacts:**

    a.    **Non-legal Telephone Contacts -**

        i.     The inmate is limited to non-legal telephone calls with his immediate family members.[7]

        ii.    The quantity and duration of the inmate's non-legal telephone calls with his immediate family members shall be set by the USMS/BOP/DF, with a minimum of one (1) call per month, unless otherwise agreed upon by USMS/BOP/DF, FBI and USA/SDNY to allow more calls.

    b.    **Rules for Telephone Calls** - For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

        i.     Is to be overheard by a third party.[8]

---

    [6] Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney of record. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

    [7] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF/FBI-verifiable) spouse, natural children, parents, and siblings.

    [8] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities when monitoring in connection with their official duties. This section does not allow monitoring of attorney/client communications.

<u>LIMITED OFFICIAL USE</u>

SPECIAL ADMINISTRATIVE MEASURES (SAM)                                      Page 9
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir

LIMITED OFFICIAL USE

      ii.    Is to be patched through, or in any manner forwarded or transmitted, to a third party.

      iii.   Shall be divulged in any manner to a third party.

      iv.   Shall be in any manner recorded or preserved.[9]

All telephone calls shall be in English unless a fluent FBI, USMS/BOP/DF- approved translator is available to contemporaneously monitor the telephone call. Arranging for a translator may require at least fourteen (14) days advance notice.

c.    **Telephone SAM Restriction Notifications** - For all non-legal telephone calls to the inmate's immediate family member(s):

      i.    USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

      ii.   USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communication of the telephone SAM. USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

      iii.   USMS/BOP/DF shall document each such telephone notification.

d.    **Family Call Monitoring** ~ All calls with the inmate's immediate family member(s) shall be:

      i.    Contemporaneously monitored by the FBI.

      ii.   Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

      iii.   A copy of each inmate/immediate family member telephone call recording shall be provided by USMS/BOP/DF on a single, individual cassette tape (per

---

[9] Except by USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities.

LIMITED OFFICIAL USE



**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                   Page 10
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir

LIMITED OFFICIAL USE

call) for forwarding to the FBI. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

e.    **Improper Communications** - If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence or terrorism, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of time to be determined by USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

f.    **Non-legal Visits -**

    I.    **Limited Visitors** - The inmate shall be permitted to visit only with his immediate family members. The visitor's identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI in advance.

    ii.   **English Requirement** - All communications during non-legal inmate visits will be in English unless a fluent FBI, USMS/BOP/DF-approved translator is readily available to contemporaneously monitor the communication/visit.

    iii.  **Visit Criteria** - All non-legal visits shall be:

        (1)   Contemporaneously monitored by USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

        (2)   Permitted only with a minimum of fourteen (14) calendar days advance written notice to the USMS/BOP/DF facility where the inmate is housed.

        (3)   Without any physical contact. All such meetings shall be non-contact to protect against harm to visitors or staff should the inmate attempt to take hostages.

LIMITED OFFICIAL USE



**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                            Page 11
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir

        (4)    Limited to one (1) adult visitor at a time. However, FBI-verified children of the inmate may visit with a pre-approved adult visitor.

g.    **Non-legal Mail** - Any mail not clearly and properly addressed to/from the inmate's attorney and marked "Privileged" (incoming or outgoing):

    i.    **Restricted** - Shall be limited to non-legal mail (incoming and outgoing) with his immediate family members. The identity and family member relationship to the inmate will be confirmed by USMS/BOP/DF and FBI.

    ii.    **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which the inmate is housed.

    iii.    **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

    iv.    **Analyzed** - After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail will be forwarded: 1) to the USMS/BOP/DF for delivery to the inmate (incoming); or 2) directly to the addressee (outgoing).

        (1)    The Federal Government will forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period of:

            (a)    A reasonable time not to exceed fourteen (14) business days for mail which is written entirely in the English language.

            (b)    A reasonable time not to exceed sixty (60) business days for any mail which includes writing in any language other than English, to allow for translation.

            (c)    A reasonable time not to exceed sixty (60) business days for any mail where the Federal Government has reasonable suspicion to believe that a code was used, to allow for decoding.



**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                     Page 12
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir

<u>LIMITED OFFICIAL USE</u>

  v.  **Mail Seizure** - If outgoing/incoming mail is determined by USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence or terrorism, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. The inmate shall be notified in writing of the seizure of any mail.

4.  <u>**Communication With News Media**</u>:

  The inmate will not be permitted to talk with, meet with, correspond with, or otherwise communicate with any member, or representative, of the news media, in person, by telephone, by furnishing a recorded message, through the mail, through his attorney, through a third party, or otherwise.

5.  <u>**No Group Prayer**</u>:

  a.  The inmate shall not be allowed to engage in group prayer with other inmates.

  b.  If an FBI and/or USMS/BOP/DF approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6.  <u>**No Communal Cells and No Communication Between Cells**</u>:

  a.  The inmate shall not be allowed to share a cell with another inmate.

  b.  The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates.

7.  <u>**Recording Conversations Between Cells**</u>:

  a.  USMS/BOP/DF/FBI are hereby authorized to place microphones in the hallways and elsewhere outside the inmate's cell to record any statements made by the inmate to other inmates or staff.



LIMITED OFFICIAL USE

b.  The Notice of SAM given to the inmate shall notify the inmate that he is subject to such recording.

8.  **Cellblock Procedures:**

a.  The inmate shall be kept separated from other inmates as much as possible while in the cellblock area.

b.  The inmate shall be limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

9.  **Commissary Privileges:**

The USMS/BOP/DF shall restrict access to commissary items or any other objects determined by USMS/BOP/DF to be capable of being converted into dangerous instruments.

10. **Access to Mass Communications:**

To prevent the inmate from receiving and acting upon critically-timed information or information coded in a potentially undetectable manner, the inmate's access to materials of mass communication is restricted as follows:

a.  **Periodicals/Newspapers -**

i.   The inmate may have access to publications  determined not to facilitate criminal activity or be detrimental to national security; the security, good order or discipline of the institution; or the protection of the public.  This determination is to be made by the FBI, in consultation with the USMS/BOP/DF and USA/SDNY.

ii.  Sections of the periodical/newspaper which offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the periodicals/newspapers prior to distribution to the inmate.

iii. The inmate shall then have access to the remaining portions of the periodicals/newspapers in accordance with USMS/BOP/DF policy, after a delay of at least thirty (30) days. In accordance with subparagraph 3(g), above,

LIMITED OFFICIAL USE



**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                   Page 14
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir

LIMITED OFFICIAL USE

the FBI will review the remaining portions of the publications prior to distribution to the inmate and be responsible for any translations required.

iv.  In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share the publication(s) with any other inmates.

b.  **Television and Radio** - The inmate is restricted from access to channels/stations which primarily broadcast news, but is permitted access to all other radio and television channels/stations, in accordance with USMS/BOP/DF policies.

c.  **Termination or Limitation** - If the USMS/BOP/DF determines that the mass communications are being used to send messages to the inmate relating to the furtherance of terrorist activities, the inmate's access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

11.  **Frequent Cell Searches:**

USMS/BOP/DF is hereby directed to search the inmate's cell frequently and to take appropriate disciplinary action for any infractions.

12.  **Transfer of Custody:**

In the event that the inmate is transferred to or from the custody of the USMS, BOP or any other DF, the SAM provisions authorized for this inmate will continue in effect, without need for any additional DOJ authorization.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney/client-privileged communications and family contact, are reasonably necessary to prevent the inmate from committing, soliciting, or conspiring to commit additional criminal activity. Moreover, these measures are the least restrictive that can be tolerated in light of the ability of this inmate to aid knowingly or inadvertently, in plans that create a substantial risk that the inmate's communications or contacts with persons could result in death or serious bodily injury to persons.

With respect to telephone privileges, the SAM is reasonably necessary because of the probability of calls to co-conspirators to arrange terrorist activities.

LIMITED OFFICIAL USE



**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                        Page 15
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir

<u>LIMITED OFFICIAL USE</u>

The SAM, with respect to mail privileges, is reasonably necessary to prevent the inmate from receiving or passing along critically-timed messages. While I recognize that eliminating the inmate's mail privileges entirely may be an excessive measure except in the most egregious of circumstances, I believe that delaying mail delivery, limiting the number of correspondents, and allowing authorized personnel to examine a copy of the mail, is sufficient at this time to adequately ensure that the mail is not used to deliver requests for, or assist in, violent and/or terrorist activities. Under this procedure, the inmate can relate personal news to family members, even if delayed, but he may find it difficult or unwise to pass along restricted information in light of these procedures.

To the extent that the use of a translator is necessary, the Government has the right to make sure that the translator given access to the inmate is worthy of trust.

The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk to public safety if the inmate advocates violent and/or terrorist offenses, or if he makes statements designed to incite such acts.

The SAM's limitations on access to newspapers, publications, television and radio are reasonably necessary to prevent the inmate from receiving and acting upon critically-timed messages. Such messages may be placed in advertisements or communicated through other means, such as the television and/or radio. While I recognize that eliminating the inmate's access to such media may be an excessive measure except in the most egregious of circumstances, I believe that limiting and/or delaying such access may interrupt communication patterns the inmate may develop with the outside world, and ensure that the media is not used to communicate information which furthers terrorist, violent and/or criminal activities.

**SAM CONTACT INFORMATION**

Any questions that you or your staff may have about this memorandum or the SAM directed herein should be directed to Christine Thren or Jack Geise, OEO. They can be contacted at: U.S. Department of Justice, Criminal Division, OEO, 950 Pennsylvania Avenue, N.W., JCK Building, Room 1200, Washington, DC, 20530-0001; telephone (202) 514-6809; and facsimile (202) 616-8256.

Exhibit B



**Office of the Attorney General**
**Washington, D. C. 20530**

LIMITED OFFICIAL USE

MEMORANDUM FOR HARLEY G LAPPIN
                    DIRECTOR
                    FEDERAL BUREAU OF PRISONS

FROM:              THE ACTING ATTORNEY GENERAL *PMc   11/25/07*

SUBJECT:           Origination of Special Administrative Measures (SAM) Pursuant to 28
                   C.F.R. § 501.3 for Federal Bureau of Prisons Inmate Oussama Kassir

    Federal prison inmate Oussama Kassir (Kassir) is charged in twelve terrorism counts
based on his participation in two different terrorist conspiracies. The charges relate to his
participation in an effort to establish a jihad training camp in Bly, Oregon and his operation of
several terrorist websites. Kassir is currently housed at the Metropolitan Correctional Center in
Manhattan (MCC New York), where he has been incarcerated since September 25, 2007,
following his extradition from the Czech Republic. His case is currently pending before the
Honorable John F. Keenan. A trial date has not yet been set.

    Oussama Kassir, also known as "Abu Abdullah" and "Abu Khadija," was a follower of
radical Islamic cleric Abu Hamza al-Masri, who is charged as a co-defendant in the same case.
The five training camp charges relate to the efforts of Kassir and others to establish a terrorist
training camp on a parcel of property located in Bly, Oregon. Those counts primarily accuse
Kassir of providing material support to terrorists and, in particular, the al Qaeda terrorist
organization, for his activities in Bly. The purpose of the Bly jihad training camp was to provide
a place where terrorists could receive various types of training, including military training to gain
familiarity with weapons or to prepare for additional military training in Afghanistan.

    In the terrorist website counts, Kassir is charged with developing and operating several
websites which promoted terrorism and contained terrorist manuals, such as "The Mujahideen
Explosives Handbook" and "The Mujahideen Poisons Handbook." Thus, seven of the counts
accuse Kassir of operating terrorist websites on the internet. Those counts also include material
support charges, and further allege violations of statutes which make it illegal to (1) provide
assistance in the development, production, and use of chemical weapons, and (2) distribute
information relating to explosives, destructive devices, and weapons of mass destruction.

SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir, Page 2

LIMITED OFFICIAL USE

Based upon information provided to me of Kassir's proclivity for violence, I find that
there is substantial risk that his communications or contacts with persons could result in death or
serious bodily injury to persons, or substantial damage to property that would entail the risk of
serious bodily injury to persons. Therefore, I am requesting that you, pursuant to 28 C.F.R.
§ 501.3, implement Special Administrative Measures (SAM) to restrict Kassir's access to the
mail, the media, the telephone, and visitors. Implementation of this SAM will commence
immediately upon notice to the inmate, and the SAM will be in effect for one year from the date
of my approval, subject to my further direction.

1.     **General Provisions:**

    a.     **Adherence to Usual United States Marshals Service (USMS), Bureau of
        Prisons (BOP) and Detention Facility (DF) Policy Requirements** - In addition
        to the below-listed SAM, the inmate must comply with all usual USMS, BOP,
        and non-BOP DF policies regarding restrictions, activities, privileges,
        communications, etc. If there is a conflict between USMS/BOP/DF policies and
        the SAM, as set forth herein, where the SAM is more restrictive than usual
        USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF
        policies are more restrictive than the SAM, then USMS/BOP/DF policies shall
        control.

    b.     **Interim SAM Modification Authority** - During the term of this directive, the
        Director, Office of Enforcement Operations (OEO), Criminal Division, may
        modify the inmate's SAM as long as any SAM modification authorized by OEO:

        i.     Does not create a more restrictive SAM;

        ii.    Is not in conflict with the request of the U.S. Attorney for the Southern
            District of New York (USA/SDNY), Federal Bureau of Investigation
            (FBI), or USMS/BOP/DF, or applicable regulations; and

        iii.   Is not objected to by the USA/SDNY, FBI, or USMS/BOP/DF.

    c.     **Inmate Communications Prohibitions** - The inmate is limited, within
        USMS/BOP/DF's reasonable efforts and existing confinement conditions, from
        having contact (including passing or receiving any oral, written or recorded
        communications) with any other inmate, visitor, attorney, or anyone else except as
        outlined and allowed by this document that could reasonably foreseeably result in



**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir, Page 3

LIMITED OFFICIAL USE

.- the inmate communicating information (sending or receiving) that could
circumvent the SAM's intent of significantly limiting the inmate's ability to
communicate (send or receive) information relating to terrorist information.

d. **Use of Interpreters/Translators by USMS/BOP/DF** - Translator approval
requirement:

 i. USMS/BOP/DF may use Department of Justice (DOJ) approved
translators as necessary for the purpose of facilitating communication with
the inmate.

 ii. No person shall act as a translator without prior written clearance/approval
from USMS/BOP/DF, which shall only be granted after consultation with
the FBI and USA/SDNY.

 iii. Translators utilized by USMS/BOP/DF shall not be allowed to engage in,
or overhear, unmonitored conversations with the inmate. Translators shall
not be alone with the inmate, either in a room or on a telephone or other
communications medium.

2.  **Attorney/Client Provisions:**

 a. **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** - The
inmate's attorney (or counsel) – individually by each if more than one – must sign
an affirmation acknowledging receipt of the SAM restrictions document. By
signing the affirmation, the attorney acknowledges his/her awareness and
understanding of the SAM provisions and his/her agreement to abide by these
provisions, particularly those that relate to contact between the inmate and his
attorney and the attorney's staff. The signing of the affirmation does not serve as
an endorsement of the SAM or the conditions of confinement, and does not serve
to attest to any of the factors set forth in the conclusions supporting the SAM.
However, in signing the affirmation, the inmate's attorney, and precleared staff,

---

 [1]The term "attorney" refers to the inmate's attorney of record, who has been verified and
documented by the USA/SDNY, and who has received and acknowledged receipt of the SAM
restrictions document. As used in this document, "attorney" also refers to more than one attorney
where the inmate is represented by two or more attorneys, and the provisions of this document
shall be fully applicable to each such attorney in his/her individual capacity.

LIMITED OFFICIAL USE

SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3
Inmate – Oussama Kassir, Page 4

LIMITED OFFICIAL USE

    ‒ ‒    acknowledge the restriction that they will not forward third-party messages to or from the inmate.

    i.    The USA/SDNY shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to the inmate's attorney.

    ii.    After initiation of SAM and prior to the inmate's attorney being permitted to have attorney/client-privileged contact with the inmate, the inmate's attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/SDNY.

    iii.    The USA/SDNY shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C. and the USMS/BOP/DF.

    b.    **Attorney Use of Interpreters/Translators** -

    i.    Necessity Requirement - No interpreter/translator (translator) shall be utilized unless absolutely necessary where the inmate does not speak a common language with the attorney. Any translator shall be precleared.[2]

    ii.    Attorney Immediate Presence Requirement - Any use of a translator by the attorney shall be in the physical and immediate presence of the attorney - in the same room. The attorney shall not patch through telephone calls, or any other communications, to or from the inmate.

    iii.    Translation of Inmate's Correspondence - An attorney of record may only allow a federally approved translator to translate the inmate's correspondence as necessary for attorney/client privileged communication.

    c.    **Attorney/Client Privileged Visits** - May be contact or non-contact, at the discretion of the USMS/BOP/DF.

---

[2]"Precleared" refers to a translator, who is actively assisting the inmate's attorney with the inmate's defense, who has submitted to a background check by the FBI and USA/SDNY, who has successfully been cleared by the FBI and USA/SDNY, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to adhere to the SAM restrictions and requirements.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir, Page 5

d.  **Attorney May Disseminate Inmate Conversations** - The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's defense – and not for any other reason – on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff.

e.  **Unaccompanied Attorney's Precleared Paralegal(s)[3] May Meet With Client** - The inmate's attorney's precleared paralegal(s) may meet with the inmate without the necessity of the inmate's attorney being present. An investigator or translator may not meet alone with the inmate. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

f.  **Simultaneous Multiple Legal Visitors** - The inmate may have multiple legal visitors provided that at least one of the multiple legal visitors consists of the inmate's attorney or precleared paralegal. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

g.  **Legally Privileged Telephone Calls** - The following rules refer to all legally-privileged telephone calls or communications:

    i.  Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls - The inmate's attorney's precleared staff are permitted to communicate directly with the inmate by telephone, provided that the inmate's attorney is physically present and participating in the legal call as well.

    ii.  Inmate's Initiation of Legally-Privileged Telephone Calls - Inmate initiated

---

[3]"Precleared" when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or an investigator who is actively assisting the inmate's attorney with the inmate's defense, who has submitted to a background check by the FBI and USA/SDNY, who has successfully been cleared by the FBI and USA/SDNY, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his/her individual capacity. A "paralegal" will also be governed by any additional DF rules and regulations concerning paralegals.



SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir, Page 6

LIMITED OFFICIAL USE

telephone communications with his attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to the inmate only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is the inmate's attorney. This privilege is contingent upon the following additional restrictions:

(1)     The inmate's attorney will not allow any non-precleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate.

(2)     The inmate's attorney must instruct his/her staff that:

      (a)     The inmate's attorney and precleared staff are the only persons allowed to engage in communications with the inmate.

      (b)     The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's communications to third parties.

(3)     No telephone call/communication, or portion thereof, except as specifically authorized by this document:

      (a)     Is to be overheard by a third party.[4]

      (b)     Will be patched through, or in any manner forwarded or transmitted to a third party.

      (c)     Shall be divulged in any manner to a third party, except as otherwise provided in Section 2(d).

---

[4]For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney/client privileged communications.

LIMITED OFFICIAL USE



SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir, Page 7

    (d)    Shall be in any manner recorded or preserved.[5] The inmate's attorney may make written notes of attorney/client -privileged communications.

    (4)    If USMS/BOP/DF, FBI or USA/SDNY determines that the inmate has used or is using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, the inmate's ability to contact his attorney by telephone may be suspended or eliminated.

h.    **Documents Provided by Attorney to Inmate** - The inmate's attorney may provide his/her client with or review with the inmate, documents related to his defense, including discovery materials, court papers (including indictments, court orders, motions, etc.), and/or material prepared by the inmate's attorney, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared translator. Any document not related to the inmate's defense must be sent to the inmate via general correspondence and will be subject to the mail provisions of subparagraphs 2 (i) and 3(g). Documents previously reviewed and cleared for receipt by the inmate, and already in the inmate's possession at the outset of the visit, may be discussed or reviewed by the inmate and the inmate's attorney during the visit.

    i.    None of the materials provided may include inflammatory materials, materials inciting to violence or military training materials, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/SDNY and the FBI.

    ii.    The USA/SDNY may authorize additional documents to be presented to the inmate. If any document not listed or described above needs to be transmitted to the inmate, consent for the transmission of the document can be obtained from the USA/SDNY without the need to formally seek approval for an amendment to the SAM.

---

[5]Except by USMS/BOP/DF, FBI, DOJ or other duly authorized federal authorities. This section does not allow monitoring of attorney/client privileged communications.



**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir, Page 8

<u>LIMITED OFFICIAL USE</u>

    f.    **Legal Mail** - The inmate's attorney may not send, communicate, distribute, or divulge the inmate's mail, or any portion of its contents (legal or otherwise), to third parties.[6]

        i.    In signing the SAM acknowledgment document, the inmate's attorney and precleared staff will acknowledge the restriction that only inmate case-related documents will be presented to the inmate, and that neither the attorney nor his/her staff will forward third-party mail to or from the inmate.

3.    **<u>Inmate's Non-legal Contacts:</u>**

    a.    **Non-legal Telephone Contacts -**

        i.    The inmate is limited to non-legal telephone calls with his immediate family members.[7]

        ii.    The quantity and duration of the inmate's non-legal telephone calls with his immediate family members shall be set by the USMS/BOP/DF, with a minimum of one call per month, unless otherwise agreed upon by USMS/BOP/DF, FBI and USA/SDNY to allow more calls.

    b.    **Rules for Telephone Calls** - For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

        i.    Is to be overheard by a third party.[8]

---

[6]Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney of record. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

[7]The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF, FBI-verifiable) spouse, natural children, parents, and siblings.

[8]For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities when monitoring in connection with their official duties. This section does not allow monitoring of attorney/client communications.

<u>LIMITED OFFICIAL USE</u>



SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir, Page 9

LIMITED OFFICIAL USE

    ii.    Is to be patched through, or in any manner forwarded or transmitted, to a third party.

    iii.    Shall be divulged in any manner to a third party.

    iv.    Shall be in any manner recorded or preserved.[9]

All telephone calls shall be in English unless a fluent FBI, USMS/BOP/DF approved translator is available to contemporaneously monitor the telephone call. Arranging for a translator may require at least fourteen days advance notice.

c.    **Telephone SAM Restriction Notifications** - For all non-legal telephone calls to the inmate's immediate family member(s):

    i.    USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

    ii.    USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communication of the telephone SAM. USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

    iii.    USMS/BOP/DF shall document each such telephone notification.

d.    **Family Call Monitoring** - All calls with the inmate's immediate family member(s) shall be:

    i.    Contemporaneously monitored by the FBI,

    ii.    Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

    iii.    A copy of each inmate/immediate family member telephone call recording shall be provided by USMS/BOP/DF on a single, individual cassette tape

---

[9]Except by USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities.

LIMITED OFFICIAL USE

SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir, Page 10

LIMITED OFFICIAL USE

(per call) for forwarding to the FBI. These recordings shall be forwarded
on a call-by-call basis as soon as practicable.

e.   **Improper Communications** - If telephone call monitoring or analysis reveals that
any call or portion of a call involving the inmate contains any indication of a
discussion of illegal activity, the soliciting of or encouraging of acts of violence or
terrorism, or actual or attempted circumvention of the SAM, the inmate shall not
be permitted any further calls to his immediate family members for a period of
time to be determined by USMS/BOP/DF. If contemporaneous monitoring
reveals such inappropriate activity, the telephone call may be immediately
terminated.

f.   **Non-legal Visits** -

i.   **Limited Visitors** - The inmate shall be permitted to visit only with his
immediate family members. The visitor's identity and family member
relationship to the inmate will be confirmed by the USMS/BOP/DF and
FBI in advance.

ii.  **English Requirement** - All communications during non-legal inmate
visits will be in English unless a fluent FBI, USMS/BOP/DF approved
translator is readily available to contemporaneously monitor the
communication/visit.

iii. **Visit Criteria** - All non-legal visits shall be:

(1)  Contemporaneously monitored by USMS/BOP/DF and/or FBI, in a
manner that allows such visits to be analyzed for indications the
visit is being used to pass messages soliciting or encouraging acts
of violence or other crimes, or to otherwise attempt to circumvent
the SAM.

(2)  Permitted only with a minimum of 14 calendar days advance
written notice to the USMS/BOP/DF facility where the inmate is
housed.

(3)  Without any physical contact. All such meetings shall be non-
contact to protect against harm to visitors or staff should the inmate



SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir, Page 11

attempt to take hostages.

    (4)    Limited to one adult visitor at a time. However, FBI-verified children of the inmate may visit with a pre-approved adult visitor.

g.    **Non-legal Mail** - Any mail not clearly and properly addressed to/from the inmate's attorney and marked "Legal Mail" (incoming or outgoing). Non-legal mail is limited to only the inmate's immediate family, U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, other federal law enforcement entities, and, if the inmate is a citizen of a foreign country, a verified consular representative of that country.

    i.    **General correspondence with limitations:** correspondence is restricted to only immediate family members. Volume and frequency of outgoing general correspondence with immediate family members only may be limited to three pieces of paper (not larger than 8 1/2 x 11), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member relationship to the inmate will be confirmed by USMS/BOP/DF and FBI.

    ii.    **General correspondence without limitations:** correspondence to U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, and other federal law enforcement entities. There is no volume nor frequency limitation on mail to/from these parties unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order or discipline of the institution, the public or national security may be jeopardized.

    iii.    All non-legal mail will be:

        (1)    **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which the inmate is housed.

        (2)    **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir, Page 12

<u>LIMITED OFFICIAL USE</u>

(3)   **Analyzed** - After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail will be forwarded to the USMS/BOP/DF for delivery to the inmate (incoming); or directly to the addressee (outgoing).

The federal government will forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period of:

(a)   A reasonable time not to exceed fourteen (14) business days for mail which is written entirely in the English language.

(b)   A reasonable time not to exceed sixty (60) business days for any mail which includes writing in any language other than English, to allow for translation.

(c)   A reasonable time not to exceed sixty (60) business days for any mail where the Federal Government has reasonable suspicion to believe that a code was used, to allow for decoding.

iv.   **Mail Seizure** - If outgoing/incoming mail is determined by USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence or terrorism, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. The inmate shall be notified in writing of the seizure of any mail.

## 4.   <u>Communication With News Media:</u>

a.   The inmate will not be permitted to talk with, meet with, correspond with, or otherwise communicate with any member, or representative, of the news media, in person, by telephone, by furnishing a recorded message, through the mail, through his attorney, through a third party, or otherwise.

<u>LIMITED OFFICIAL USE</u>

SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir, Page 13

<u>LIMITED OFFICIAL USE</u>

5. <u>No Group Prayer:</u>

    a.    The inmate shall not be allowed to engage in group prayer with other inmates.

    b.    If an FBI and/or USMS/BOP/DF approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6. <u>No Communal Cells and No Communication Between Cells:</u>

    a.    The inmate shall not be allowed to share a cell with another inmate.

    b.    The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates.

7. <u>Recording Conversations Between Cells:</u>

    a.    USMS/BOP/DF, FBI are hereby authorized to place microphones in the hallways and elsewhere outside the inmate's cell to record any statements made by the inmate to other inmates or staff.

    b.    The Notice of SAM given to the inmate shall notify the inmate that he is subject to such recording.

8. <u>Cellblock Procedures:</u>

    a.    The inmate shall be kept separated from other inmates as much as possible while in the cellblock area.

    b.    The inmate shall be limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

9. <u>Commissary Privileges:</u>

    a.    The USMS/BOP/DF shall restrict access to commissary items or any other objects determined by USMS/BOP/DF to be capable of being converted into dangerous

<u>LIMITED OFFICIAL USE</u>

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir, Page 14

LIMITED OFFICIAL USE

-  instruments.

10.   Access to **Mass Communications:**

To prevent the inmate from receiving and acting upon critically-timed information or
information coded in a potentially undetectable manner, the inmate's access to materials
of mass communication is restricted as follows:

a.   **Periodicals/Newspapers** -

   i.   The inmate may have access to publications determined not to facilitate
        criminal activity or be detrimental to national security; the security, good
        order or discipline of the institution; or the protection of the public. This
        determination is to be made by the FBI, in consultation with the
        USMS/BOP/DF and USA/SDNY.

   ii.  Sections of the periodical/newspaper which offer a forum for information
        to be passed by unknown and/or unverified individuals, including but not
        limited to classified advertisements and letters to the editor, should be
        removed from the periodicals/newspapers prior to distribution to the
        inmate.

   iii. The inmate shall then have access to the remaining portions of the
        periodicals/newspapers in accordance with USMS/BOP/DF policy, after a
        delay of at least thirty (30) days. In accordance with subparagraph 3(g),
        above, the FBI will review the remaining portions of the publications prior
        to distribution to the inmate and be responsible for any translations
        required.

   iv.  In order to avoid passing messages/information from inmate to inmate, the
        inmate shall not be allowed to share the publication(s) with any other
        inmates.

b.   **Television and Radio** - The inmate is restricted from access to channels/stations
     which primarily broadcast news, but is permitted access to all other radio and
     television channels/stations, in accordance with USMS/BOP/DF policies.

c.   **Termination or Limitation** - If the USMS/BOP/DF determines that the mass
     communications are being used to send messages to the inmate relating to the

LIMITED OFFICIAL USE

SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3
Inmate - Oussama Kassir, Page 15

LIMITED OFFICIAL USE

- furtherance of terrorist activities, the inmate's access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

11. **Frequent Cell Searches:**

   a.   USMS/BOP/DF is hereby directed to search the inmate's cell frequently and to take appropriate disciplinary action for any infractions.

12. **Transfer of Custody:**

   In the event that the inmate is transferred to or from the custody of the USMS, BOP or any other DF, the SAM provisions authorized for this inmate will continue in effect, without need for any additional DOJ authorization.

LIMITED OFFICIAL USE